## Case No. 14,477.

UNITED STATES v. The AUGUSTA.[1]

District Court, S. D. New York. September, 1861.

### SLAVE TRADE—EVIDENCE—JUDICIAL NOTICE.

[1. A vessel was purchased and fitted out ostensibly for a short whaling voyage, but her outfit, admitted to be nearly complete, was entirely inadequate for such a voyage; her meat being deficient in quantity, and a large part of it tainted. No adequate preparations had been made for shipping such experienced officers and crew as were indispensable for a whaling voyage. The whaling business had ceased to be generally profitable, and her pretended voyage would have exposed a whaler, but not a slaver, to capture by Confederate cruisers. She had an immense quantity of salt, and an excess of rice, corn, beans, and firewood, for a whaling voyage, with an unusual quantity of water, partly in oil casks, all suitable for a slaver. *Held*, that she was fitted out with the intent to employ her in the slave trade, within the meaning of Act March 22, 1794, § 2 (1 Stat. 349), and Act April 20, 1818 (3 Stat. 450), and must, with her tackle and lading, be declared forfeited to the United States.]

[2. Where a libel in rem against a pretended whaling vessel by the United States charges that she is being fitted out with the intent to em-

ploy her in the slave trade, a court of admiralty will take judicial notice of the fact that the projected voyage would have exposed a whaler, but not a slaver, to capture by Confederate cruisers.]

[See The Augusta, Case No. 647.]

In admiralty.

C. Delafield Smith, U. S. Dist. Atty., and Stewart L. Woodford, Asst. Dist. Atty.

Benjamin F. Sawyer, for owners of the bark.

SHIPMAN, District Judge. The libel is founded on the second section of the act of March 22, 1794, and on the act of April 20, 1818, and charges that the bark in question was fitted out at Greenport, L. I., with the intent to employ her in the slave trade. A claim and answer have been filed by Jacob A. Appley, alleging that the vessel is owned by him, and that she was fitted by him and Appleton Oaksmith, his agent, for a whaling voyage, and that there was no intent to employ her in the slave trade, nor in any unlawful enterprise whatever. The vessel was purchased by Appley about the 1st of June, last, and was seized on the 23d of the same month. The simple question that arises on the pleadings and proofs is whether the Augusta was fitted out with the intent to employ her in the slave trade. The answer denies the allegations of the libel charging the illegal intent, and avers that the intent was an innocent one, to wit, to employ the vessel in a whaling voyage, and that she was fitted for that purpose. I will condense the several general claims urged by the libellants, under separate heads, and examine them severally, together with the considerations urged in reply by the respondent. It is insisted by the government that it appears from the evidence: (1) That the outfit of this vessel was made from a port at which the whaling business had been abandoned several years ago. (2) That she is a larger and a much more expensive vessel than is ever used on a short voyage like the one for which the claimant says he fitted her. (3) That her outfit and fittings were admitted by Oaksmith, at the time of the seizure, to be nearly complete, except a few small cabin stores; and the libellants insist that this outfit, and the provisions and water, were entirely inadequate for such a whaling voyage. (4) That no adequate preparations had been made for shipping such experienced officers and crew as were indispensably necessary, and as would have been made, had such a voyage been contemplated. (5) That the comparatively low price of oil, and the general declension of the whaling business to a point where it ceased to be generally remunerative, are inconsistent with the claim that she was designed for that business. (6) That her outfit, water, and provisions indicate that she was intended for the slave trade.

1. With regard to the first of these claims, I do not think it entitled to much weight. It is true that it appears from the evidence that

[1] [Not previously reported.]

the whaling business, which was formerly prosecuted with success from Greenport, has been, for several years, entirely given up. But there is nothing in the place, as to harbor or facilities for outfit, that I can discover in the evidence, which renders it at all difficult to fit a vessel at that port for the business of whaling. It is not very far from several other whaling ports, where officers and crews of experience in the business could be found, if desired.

. 2. The second claim is that the vessel is entirely too large and expensive for the voyage for which the claimant insists he intended her. On this point, several highly-respectable witnesses have testified that the Augusta was a much larger vessel than it is usual to fit for so short a time as 15 months,—the period for which the claimant says he fitted her. These witnesses are thoroughly acquainted with the business, and speak from long experience. And it is quite obvious that no man would think of sending a large vessel on a voyage which could be as well, and perhaps better, performed by a small one, thereby increasing the number of men, the expenses of the outfit, and the whole cost of the voyage, unless, indeed, he had the vessel on his hands, and had no other employment for her. He certainly would not do this in a business which is so liable to losses as that of whaling now is, where the risks, and even probabilities, of a losing voyage, are already too great, without loading the enterprise with unnecessary expense in advance. The witnesses already referred to testify that these short voyages are prosecuted by a very much smaller class of vessels, and, of course, are fitted at a much less expense, and with a smaller crew, who are to receive wages, and share in the fruits of the voyage. The claimant did not own this vessel, and therefore employ her in this unpromising business in order to keep her from lying idle, but he went into the market and bought her, paying cash for her. It is true that vessels were cheap at the time, owing to the depression of commerce, but it has not been shown that large vessels were cheaper than small ones; nor, if cheaper, that they were enough so to justify their employment at greater expense in a business where smaller ones would answer just as well. There were several witnesses who testified on behalf of the claimant who had some experience in the whaling business; and I now recollect no one pretending that this vessel was of such a size that they should have purchased her for such a voyage, unless it be Mr. Wells, who stated that, if he was going to fit the Augusta, he should fit her for a short voyage, of 15 or 18 months, and for this he gave no reasons.

3. We next come to a much more important point,—that relating to the outfit of this vessel, including her provisions. The libellants insist that the outfit and the provisions of the Augusta were substantially complete when she was seized; and they rely mainly as to this point, upon the alleged admission of Oaksmith, the agent of the claimant, that such was the fact. This admission of Oaksmith is said to have been made on board of the vessel, the day after her seizure. Dr. Skinner, the surveyor of the port of Greenport, his son E. D. Skinner, and Horton, the deputy marshal, all testify that Oaksmith said that everything was on board except a few small or cabin stores. They recollect the conversation substantially alike, except that Horton says that Oaksmith added that the hatches were down for the voyage. To the direct testimony of these three witnesses is opposed the denial of Oaksmith, and it is no disparagement to him to say that the testimony of the two Skinners and Horton must prevail. And even Oaksmith, in his testimony, says that he might have stated that the vessel was nearly ready for sea, except some whaling gear and some cabin stores. But this does not alter the comparative weight of this part of the evidence, for there is no evidence in the case which shows that there was any whaling gear, worth mentioning, purchased, or intended to be purchased, to be put on board, except a small quantity of tow line, which belonged to Mr. Floyd. It might be said that this was a foolish admission for Oaksmith to make, and one manifestly against the interest of his principal, and uncalled for. But as it is pretty obvious, from the whole case, that nearly or quite all the articles which were specially adapted to whaling, which it was intended to take, were already purchased and on board, and as Horton asked the question whether she was loaded, it became necessary to answer it; and, if the answer had been in the negative, it would not have excluded the inference that any deficiencies which existed in an illegal outfit were still to be supplied. Assuming, then, the fact as proved, that the outfit of this vessel, so far as those articles which are specially appropriate for a whaler are concerned, was as complete as it was intended to be by the fitter, let us see if it was such an outfit as a whaler would require. Was it, in other words, a bona fide preparation for a whaling voyage, intended to conceal the true purpose of the voyage? On this branch of the case, I do not intend to go into minute details, but to name some of the important articles in which she was deficient for a voyage of the character mentioned. She was materially wanting in tow lines, whale irons, iron poles, knives, axes, hoop iron, and grindstones. She was also greatly deficient in flour, molasses, and vinegar, and considerably in the quantity of beef and pork. There is one very extraordinary fact in regard to the beef. Several barrels of it were good and sweet, and suitable for the crew to eat, but the greater portion was more or less tainted. An explanation of this fact was attempted, but was wholly unsatisfactory to my mind. Mr. Oaksmith's account of it is that in purchasing provisions he came across a very fine lot of

clear beef, that had been intended for the navy, in good condition, but requiring repacking, and that it was understood that Capt. Case was to repack it at sea. Oaksmith says that he was not disappointed to hear it was found spoiled, after the time which had elapsed after the seizure, the beef not having been repacked. But why did he not communicate the fact that this large quantity of beef required immediate care to preserve it, so that the officers of the law, who had the vessel in charge, could have had it repacked, and thus have prevented the loss? Here were 47 barrels of beef, that, according to his statement, could have been saved, had he stated its condition to the marshal, or to any one in charge of the vessel after the seizure. And why this extraordinary explanation, left without any support, except the testimony of Mr. Oaksmith, when, if it is true, the most abundant confirmation could be had? Where are the parties of whom this beef is purchased? Why are they not called to prove its quality? This meat, when first examined after the seizure, was found to be injured; and, in the absence of any better explanation than has been given thus far, I shall hold that it was in that condition when shipped. This being the case, this vessel was in no condition to go on a voyage of 15 months, nor even 6 months. And, taking her beef and pork together, it was deficient in quantity, assuming it all to be good. The effect of this was attempted to be obviated by the claimant by proof that this deficiency could be supplied at reasonable rates in foreign ports, but this attempt wholly failed. It was proved conclusively, to my mind, that no one would send a whale ship to sea, short of provisions, upon the idea of supplying the deficiency in foreign ports, where they are higher than here at home. There are other deficiencies in the outfit of this vessel that are, to my mind, inconsistent with the idea that she was bound on a long voyage, but many of which could be well dispensed with if her voyage was to be a short one. True, it was said on the trial, by Oaksmith, that there were some things purchased and in the store that were to have been put on board. But no list of them has been given, and no merchant of whom they were purchased has been produced to prove such purchase. A general statement that there were many articles in packages in the loft of the store in Greenport that were to supply the glaring deficiencies of this outfit, without particularizing the articles, or showing when, where, and of whom they were purchased, is altogether too vague to be entitled to material weight.

4. The fourth claim of the libellants, that no proper steps had been taken to engage that portion of the officers and crew which must have been taken from experienced whalemen, is entitled to consideration. Capt. Case says that he had engaged his mate, Mr. John Firman. The latter is not here to testify; having, it is said, shipped on another vessel since the seizure of the Augusta. Capt. Case says he asked him if he would go as mate of the Augusta, and he said he would; but at what day, or upon what terms, does not appear. It is in proof that another mate, three boat steerers, and several experienced seamen, who had served on board of whalers, would be necessary for the voyage, not one of whom was engaged. Capt. Case testifies that a boat steerer came, and applied for a berth, and was told that some inquiries would have to be made as to his competency. None were ever made. A second mate and some experienced whalemen also applied, but none were engaged, and no inquiries made about the competency of those who had applied. No inquiries seem to have been made as to where they could be found if wanted. The vessel was seized the 23d of June, and Capt. Case testifies that he expected to get away the 5th to the 8th of July. About two weeks only remained before the time of sailing, and no inquiries made even for an officer, or for experienced whalemen, and not even a first mate definitely engaged. I think this entirely inconsistent with the idea that this was intended as a bona fide whaling voyage. It is quite consistent with the idea that her officers and men were to consist, not of our honest whalemen, but of those desperate adventurers and reckless sailors who infest our large seaports, and who are ready to embark in that inhuman traffic which the courts and the navies of most of the civilized world have as yet in vain striven to suppress.

5. It appears in proof that from the present price of oil, the scarcity of whales, and the losses that are constantly accruing in the business, it is fast being abandoned. This branch of our fisheries, so full of peril and hardship to the mariner engaged in it, and once so lucrative to those who supplied the capital, must probably very soon be discontinued altogether. The one-season voyages—voyages very much like that which the Augusta was alleged to be fitting for—are almost, or quite entirely, discontinued by vessels of any considerable size. Capt. Case, who has followed whaling until within three years past, says that the last one-season voyage he made was in 1838. But, where the whaling business is continued at all, it is generally by those who have the ships on hand, and not by those who build or buy them for that purpose. And it would be very extraordinary for this claimant, who lives at Southold, in the vicinity of Greenport and Sag Harbor, old whaling ports,—in the former of which he has witnessed the total extinction of the business, and in the latter its rapid decay,—to undertake to purchase ships, and embark in so expensive and yet so precarious an enterprise. Both Appley and Oaksmith were unacquainted with the details of this business, which, in its depressed condition, if to be pursued at all, should be superintended by that rigid economy and thorough appreciation of its conditions and necessities

that experience alone could give. It is true that one or two men were consulted in regard to the outfit, but it was mere consultation as to what would be needed. There was no such thorough preparation touching the outfit or provisioning of this vessel as the nature of the alleged enterprise demanded, either as to the quality or quantity which she would need. Capt. Case's attention to her, according to his own statement, seems to have been of the most indifferent character, and wholly unlike what might have been expected from the excellent reputation he bore as a good whaleman, knowing as he did the inexperience of both Oaksmith and Appley. But there is another consideration which must have operated as a heavy discouragement against embarking just at this time in this already greatly depressed business, and, although it was not noticed on the hearing, yet as it is a fact of which the court is judicially cognizant, I cannot pass it over; and that is the danger of capture by so-called privateers. The claimant alleges the voyage was to be in the Atlantic,—the only ocean infested by these depredators. It might be replied that a valuable slave cargo would be equally or more liable to capture by the same cruisers. But it may be well doubted whether these cruisers would capture a slave cargo at the present time. There must be little or no sale in the Southern ports for this kind of "property," in the present condition of things there, and the captors would not be permitted to sell the prize in Cuba. There would be very little danger, therefore, that such a cargo would be molested in that quarter.

I am therefore of the opinion, upon these branches of the case which I have already examined, that the Augusta was not fitted for a whaler, but that what was done ostensibly for that purpose was merely colorable, and to conceal the real enterprise contemplated. What was that enterprise? That it was a guilty one, there can be no doubt, assuming the concealment to have been proved. But was it the particular guilty intent charged in the libel? The answer to this question involves our sixth and last topic of consideration. It is quite obvious that this vessel was well adapted, as to size and construction, to carry a slave cargo. She had two permanent decks, which dispensed with the necessity of a temporary slave deck. The large fry works were admirably fitted for cooking the slaves' food, and were ample in size for the necessities of a large number of negroes. She was evidently provisioned, so far as the wants of the crew were concerned, for a short voyage, for her sweet provisions would only last for such a voyage. Yet she had 20 cords of wood, which would not be needed for a short voyage, except upon the idea that she was going into high, cold latitudes, which is not pretended, or that she was going to have a large number of persons on board to cook for. She had eight barrels of salt, which would be needed in cooking the farinaceous food necessary for such a cargo, but which was utterly uncalled for on board a whaler, except upon the notion that the beef, as suggested by Oaksmith, was to be repacked at sea. This witness says that this is what it was intended for, but I have already disposed of that claim, and it is in proof that 30 pounds would have been sufficient for a whaling voyage of 15 months. The Augusta had also an excess of rice, corn, meal, and beans, even for a whaling voyage. This excess, it is true, was not very large for such a voyage; but, if the voyage was to be a short one,—and I find it was intended to be,—then the excess would be larger. There were between 13,000 and 14,000 pounds of bread, which was no more than could be needed for the whaling voyage, but, for a short one, was greatly in excess. So the beef, besides being unfit for the sailors, was in a quantity greatly in excess for a short voyage with only a crew. Now, it is an extraordinary coincidence that the articles that are in excess are all well adapted for slave consumption, unless it be the injured meat; and, as the present evidence stands on that point, I infer that that was intended for their use, also. The vessel also had an immense supply of fresh water in casks. A portion of this was in casks that once had oil in them, but it seemed to be generally conceded on the hearing, and was so stated by some witnesses for the respondent, that the fact that these casks had once oil in them would only injure the flavor, but not the salubrity, of the water. On this point the counsel for the respondent insists that the water would have a very disagreeable and repulsive taste, and that the court ought not to assume that even slave traders are destitute of all humanity, and that they would provide water of this character for the slaves to drink. But, unfortunately, the well-known history of this traffic discloses very few humane features. Language failed to furnish an adequate description of its enormities when it was legalized by Christian nations, and pursued in open day; and, by common consent, that inadequate description was longe since condensed into the single phrase, "Horrors of the Middle Passage." Now that it is carried on under the ban of nations, its vessels stealing forth from our ports in disguise, and running the gauntlet of navies, those employed in it under fear of being seized and tried as pirates, it can hardly be expected to have become more humane. This immense quantity of water was necessary only for the transportation of such a crew or cargo as would require it for consumption; and if I am right in the conclusion that this was not a whaling voyage, but was to be a comparatively short one, and for a different object, then to what kind of a voyage does this outfit point? Concealment implies guilt, and what other guilty traffic demanded such an outfit? It might be claimed that the quantity of provisions was not adequate to feed a slave cargo, and this is probably true, so

far as many of the articles are concerned. But all the heavy articles were on board,—the water, the beef and pork, boilers for cooking, and wood, and a considerable quantity of rice, beans, corn meal, and a large quantity of bread. All that would be necessary to complete the outfit of slave food could have been done in a very brief time. I think the fitment in this particular sufficient to clearly indicate, under the peculiar circumstances of this case, the real object of this voyage. My opinion, therefore, is that this vessel was fitted out by the claimant with the intent to employ her in the slave trade. I have carefully examined the evidence in the case, and, on a review of the whole of it, no reasonable doubt rests in my mind that such was the intent with which she was fitted. She must, therefore, with her tackle and lading, be declared forfeited to the United States, and a decree of condemnation accordingly entered.